ROBERTS J., for the Court.
¶ 1. Lisa Trim (Lisa) filed a petition to set aside a final judgment of divorce and property settlement agreement. She asserted that her ex-husband, George Trim (George), had fraudulently understated the value of his assets in his Uniform Chancery Court Rule 8.05 statement during their divorce proceeding. The chancellor agreed and found that George had fraudulently listed the value of his company stock and awarded Lisa half of its value. George now appeals the chancellor’s ruling arguing that: (1) Lisa’s motion was untimely, and (2) he did not fraudulently list the value of his company stock. A thorough review of the record and applicable case law reveals that the chancellor erred when he failed to treat Lisa’s claim as untimely and when he treated her petition to set aside the final judgment of divorce and/or property settlement agreement as a motion to modify a property settlement *482 agreement. Accordingly, we reverse and render.
FACTS AND PROCEDURAL HISTORY
¶ 2. On November 16, 1990, George and Lisa were married in Hinds County, Mississippi. No children were born to the marriage. Over the course of their marriage, Lisa worked as a sales representative for the Berry Company selling yellow page advertisements, and George was self-employed in a computer networking and cabling business, Business Communications, Inc., (BCI). In 1993, George and Tony Bailey (Bailey) partnered to form (BCI), which is a closely-held subchapter S for profit corporation. Bailey owned fifty-one percent of the stock, with George owning a minority share of forty-nine percent.
¶ 3. George and Lisa continued to live as husband and wife until their separation in September 1999. Around the time of their separation, George and Lisa discussed their financial status. George thought that the value of his stock in BCI was worth $100,000, and Lisa owned a retirement account valued at $120,000. The equity in George and Lisa’s home was $30,000. George proposed that Lisa keep her retirement account; he keep his BCI stock and their home; and he pay Lisa $5,000 to make up the difference. In essence, the couple divided their marital assets equally. After this, on September 24, 1999, Lisa signed a property settlement agreement reflecting the couple’s decision.
¶ 4. George and Lisa did not file for divorce until seven months later. On April 10, 2000, George and Lisa filed a Joint Complaint and Consent to Divorce based on irreconcilable differences. They also attached the above property settlement agreement to their complaint. Pursuant to Uniform Chancery Court Rule 8.05 (hereinafter 8.05), each party submitted a financial statement of their assets and liabilities to the court. In his 8.05 statement, George again listed the value of his BCI stock at $100,000. On June 14, 2000, the Hinds County Chancery Court entered a final judgment granting a divorce to George and Lisa and ratified the property settlement agreement attached in the divorce complaint.
¶ 5. Following the divorce, in 2001, the business relationship between George and Bailey began to deteriorate. In July 2001, at a board of directors’ meeting, Bailey and a third director voted to fire George as president of the company and reduce his management responsibilities and salary. As a result of being “squeezed out” of the company, George filed suit against Bailey and BCI alleging breach of fiduciary duty and wrongful breach of minority rights. He sought to have the company dissolved. Pursuant to statutory requirements, the Madison County Chancery Court held a hearing to determine the value of George’s BCI stock, and the court determined that the better result, rather than to dissolve the company, was to have BCI pay George for his stock and for George to relinquish any rights in BCI. The stock valuations presented in that hearing spurred the present litigation between Lisa and George.
¶ 6. During the litigation between George and Bailey, each party presented expert testimony to determine the value of George’s stock, and the chancellor adopted George’s expert’s finding that the stock was worth $1,186,000 as of August 14, 2001. During the Trim v. Bailey[1] litigation, the chancellor expressed dissatisfac *483 tion with the determined values because of the disparity of findings between the parties’ experts. However, due to the parties’ unwillingness to hire a third expert, he felt bound to choose one of the amounts, so he chose the higher value. It is clear that difficulty existed in placing a definitive monetary value on the stock. Rather, determinations were based on numerous factors that were not easily discernible and resulted in vastly different valuations.[2]
¶ 7. Lisa waited until November 19, 2004, to file suit against George claiming that he had fraudulently misrepresented the value of his stock when they were discussing their property settlement agreement over five years earlier in September 1999. In the Trim v. Trim[3] litigation, Lisa hired a third expert, which presented yet another opinion concerning the value of George’s stock. Lisa’s expert valued George’s stock at $694,000 at the time of George and Lisa’s divorce. The chancellor accepted this opinion and awarded Lisa 25% of this amount. In other words, Lisa received an additional $148,000 plus attorneys’ fees and costs. The judgment from that litigation is now the subject of this appeal.
STANDARD OF REVIEW
¶ 8. This Court has established:
The standard of review by this Court in domestic relations cases is well-settled. Chancellors are vested with broad discretion, and this Court will not disturb the chancellor’s findings unless the court was manifestly wrong, the court abused its discretion, or the court applied an erroneous legal standard. However, we will not hesitate to reverse should we find that a chancery court was manifestly wrong, abused its discretion, or applied an erroneous legal standard.
Pulliam v. Smith, 872 So.2d 790, 793(¶ 5) (Miss.Ct.App.2004) (internal citations omitted) (emphasis added).
I. WHETHER THE CHANCELLOR ABUSED HIS DISCRETION IN FINDING GEORGE’S CONDUCT TO BE FRAUDULENT.
¶ 9. Although the chancellor believed that George had “wilfully, knowingly, and fraudulently undervalued his income and the value of 49% stock in Business Communications, Inc.,” the record does not fully support that determination. “Fraud is ‘a knowing misrepresentation of the truth or concealment of a material fact to induce another to act to his or her detriment.’ ” Mitchell v. Nelson, 830 So.2d 635, 639(¶13) (Miss.2002) (quoting Black’s Law Dictionary 670 (7th ed.1999)). “Additionally, the elements of fraud must be prove[n] by clear and convincing evidence.” Id. at 639(¶ 13). As the Mississippi Supreme Court has recited:
The elements of fraud, which must be proven by clear and convincing evidence, include: 1) a representation; 2) its falsity; 3) its materiality; 4) the speaker’s knowledge of its falsity or ignorance of its truth; 5) his intent that it should be acted upon by the person and in the manner reasonably contemplated; 6) the hearer’s ignorance of its falsity; 7) his reliance on its truth; 8) his right to rely thereon; and 9) his consequent and proximate injury.
In re Estate of Law, 869 So.2d 1027, 1029(¶ 4) (Miss.2004).
*484 ¶ 10. It is not entirely clear from the record that George knowingly misrepresented the truth to Lisa regarding the value of his stock, nor is it entirely clear that Lisa had a right to rely on George’s opinion. As stated, the record reveals that during the litigations following George and Lisa’s divorce, three different experts valued George’s stock with a low of $111,000 and a high of $1,186,000. There is no consensus concerning the value of George’s stock in BCI. In order to find that George fraudulently misled Lisa, it must be shown that he knew that his stated value of the stock was wrong, and that he intended for Lisa to rely on a false representation. Also, it must be shown that Lisa was ignorant of any misrepresentation by George. It is not evident from the record that the elements of fraud have been met. First, we will address George’s representation of his stock’s value, and second, we will address Lisa’s naivete, or the lack thereof, in her acceptance of George’s belief concerning the value of his BCI stock.
¶ 11. In determining that George had misrepresented the value of his stock, the chancellor seemed to place great emphasis on a 1999 financial statement that George signed prior to the divorce. The financial statement was prepared in order to maintain a revolving line of credit for the company, and the company submitted such financial statements for George and Bailey each year. On George’s financial statement, it was stated that the value of the stock was $1,100,000. Obviously, this amount is in stark contrast to George’s personal estimation given in his 8.05 financial statement.[4] However, uncontradicted testimony by George reveals that the personal financial statement, which was presented to the bank, was not completed by him, but rather by BCI office personnel in order to renew BCI’s revolving line of credit; he simply signed it. George testified that he signed it even though he thought it was incorrect. There is no way to know for certain whether this account is accurate. However, when attempting to discern the veracity of George’s testimony, which was that he merely signed off on the forms prepared by others, it is relevant to note that George was relatively uneducated and quit school at the age of sixteen.[5]
¶ 12. George also testified that he did not believe that the stock was worth what the 1999 financial statement stated when he and Lisa discussed the property settlement agreement and later when he completed his 8.05 financial statement. He thought it was only worth about $100,000 because of the significant changes that occurred within the company during 1998 and 1999. During that time, the company lost two of its owners, completed a major project for which it had not been paid, lost and hired employees including a new chief financial officer, and purchased a new software company. Considering that George only had “sweat equity” in the company and a limited education, it is quite conceivable that he was not systematically trying to defraud Lisa; rather, he merely left the financial workings of the company to his partner, Bailey, and other office person *485 nel.[6] George’s testimony about his belief regarding his stock’s value is not that farfetched considering that three different qualified experts assessed three distinct and widely divergent valuations ranging from $111,000 to $1,186,000. We are hard pressed to conclude that the evidence is convincing that there was an intentional fraudulent scheme perpetrated by George upon Lisa.
¶ 13. Second, we address Lisa’s naive reliance on George’s representation concerning his stock’s value. Lisa claimed that she simply depended on George’s opinion and that she was ignorant of the workings or intricacies of the business that she and George had been involved in since 1993, six years prior to the divorce. Lisa’s own testimony casts doubt upon this claim.
¶ 14. Lisa testified that she was involved in BCI by “signfing] financial documents, performance bonds, [and] helping [George] interview people.” Furthermore, she testified that she hosted parties for the company, traveled with him on business, and performed “walk-throughs” for jobs in Colorado and Las Vegas.[7] When asked if she considered herself working for BCI, she distinctly stated that “[she] was there on work.” Lisa signed surety bonds for BCI and acknowledged that she was aware that by signing such bonds, she had the risk of “losfing] everything.” On one hand, she claimed to work at and be very involved with the company; while on the other hand, she claimed to barely know George’s partner or any details surrounding the closely-held company. It is unclear exactly where the truth lies. Although the extent of her involvement may be debatable, there are no facts in the record to support a belief that Lisa was denied access to BCI and the financial information related to George’s stock or that such information was hidden from her. Rather, she simply declined to pursue the information.[8]
¶ 15. Considering these facts and the reality of Lisa’s involvement in the business, it is questionable that three of the nine elements of fraud are met. These are: the speaker’s knowledge of its falsity or ignorance of its truth; the hearer’s ignorance of its falsity; and the right to rely thereon. The record reveals that Lisa is a competent person with adequate business acumen. In addition to Lisa’s account of her involvement with BCI at the time of the divorce and subsequent litigation, she had been an employee of the Berry Company, which sells Yellow Page advertising, for nearly two decades. Due to her success, she achieved an income of nearly $100,000 per year. Furthermore, Lisa testified that when they were dissolving their marriage and determining who would keep the home and so forth, “[she and George] sat down and figured up [what] George’s stock was worth.” Lisa testified that the reason for this was “to go ahead and get the divorce.”[9] George’s involvement with BCI was not hidden from Lisa, nor was she a stranger to those *486 involved with the company. Before agreeing to the property settlement agreement and no fault divorce, if Lisa had any genuine doubts about George’s estimate of the value of his stock, she could have refused to execute the property settlement agreement or to get the divorce; she and George could have agreed to have the value of his stock determined by an appraiser or by the chancellor; she could have demanded financial records from BCI before deciding; or she could have taken other such appropriate action. She simply chose not to do so.
¶ 16. Although the facts place genuine doubt upon a legitimate fraud claim, we are not prepared to conclude, and do not find it necessary to decide, that the chancellor erred when he found fraud. Rather, the determinative issue is whether Lisa’s petition was timely under Rule 60(b), and whether the chancellor erred when he decided to consider Lisa’s petition to set aside the divorce and property settlement agreement as a motion to modify the property settlement agreement instead. The clear language of the rules and established case law mandate a finding that Lisa’s petition was time-barred; therefore, the chancellor was incorrect in his decision to modify the property settlement agreement.
II. WHETHER LISA’S MOTION TO SET ASIDE THE DIVORCE AND PROPERTY SETTLEMENT AGREEMENT WAS TIMELY FILED.
¶ 17. Rule 60(b) of the Mississippi Rules of Civil Procedure provides in part:
On motion and upon such terms as are just, the court may relieve a party or his legal representative from a final judgment, order, or proceeding for the following reasons:
(1) fraud, misrepresentation, or other misconduct of an adverse party;
(2) accident or mistake;
(3) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b);
(6) any other reason justifying relief from the judgment.
The motion shall be made within a reasonable time, and for reasons (1), (2), and (3) not more than six months after the judgment, order, or proceeding was entered or taken.”
M.R.C.P. 60(b) (emphasis added). Lisa’s petition, the chancellor’s opinion, and established case law all reveal that Lisa’s claim falls squarely under Rule 60(b)(1) and is, therefore, time-barred.
¶ 18. The chancellor stated in his order and opinion that Lisa learned of the different stock valuation in 2002 and that she sought legal counsel in the same year. However, she did not file her petition until November 2004. Lisa claims that she hired two attorneys who failed to take action against George before she finally found an attorney who filed suit nearly four and one-half years after the final judgment of the divorce.[10] Consequently, she missed her six-month window of opportunity to file her claim for fraud pursuant to Rule 60(b)(1). As this Court stated in Tirouda v. State of Mississippi, 919 So.2d 211, 214(¶ 8) (Miss.Ct.App.2005), “[fjraud upon an adverse party falls under Rule 60(b)(1) which requires that motion be made in a reasonable time and not more *487 than six months after the judgment, order, or proceeding was entered or taken.”
¶ 19. Because the chancellor found George’s conduct egregious, he utilized Rule 60(b)(6) to fashion a remedy for Lisa. Although Rule 60(b)(6) provides a “catch-all” provision, which may be granted in exceptional circumstances, it simply does not apply to the case at hand. First of all, an attorney’s failure to file a petition timely is insufficient to qualify as an extraordinary or compelling circumstance, and second, “[u]se of Rule 60(b)(6) must be based on some reason other than the first five enumerated clauses of the rule.” Mitchell, 830 So.2d at 639(¶ 9) (emphasis added). Clearly, Lisa’s fraud or misrepresentation claim falls squarely within Rule 60(b)(1). Therefore, Rule 60(b)(6) is not an available remedy for her.
¶ 20. In support of his decision, the chancellor relied on Kalman v. Kalman, 905 So.2d 760 (Miss.Ct.App.2004), but Kal-man is factually dissimilar to the instant appeal. In Kalman, neither the husband nor the wife had signed an 8.05 financial statement, and the undisclosed information related to the husband’s purchase of a lottery ticket and undisclosed winnings of $2,600,000 about a month prior to the couple filing for divorce and about four months prior to the final divorce decree being entered. Id. at 761(¶ 1). The instant matter does not deal with something as bizarre as a litigant winning the lottery one month prior to divorce and hiding his winnings from his spouse and the court. Rather, this case involves a business in which Lisa was actively involved with readily discoverable financial information. Lisa could have easily discovered the 1999 financial information, as well as any other financial documents related to BCI, prior to the divorce had she chosen to do so.
¶ 21. If George had perpetrated a fraud upon the court,[11] there would be no limitation of time for the court to pursue a remedy, other than a reasonable one. See, Tirouda 919 So.2d at 214(¶ 8). In Tirouda, where the defendant employed numerous witnesses to deceive the court in order to acquire a fraudulent birth certificate, this Court stated that “fraud upon the court falls within the savings clause of [Rule] 60(b) and is not subject to time constraints.” Id. The instant case is distinguishable. Realizing that Lisa was outside the time limitations imposed by Rule 60(b), the chancellor accurately stated, “the issue I have got to decide is if [George] perpetrated fraud on the Court.” However, the chancellor, clearly found that George’s actions did not “rise to the level of ‘fraud upon the court.’ ” Despite this realization and the fact that the six-month time period had run on Lisa’s fraud claim, the chancellor decided to consider Lisa’s petition to set aside the divorce and property settlement agreement as a petition to modify the decree and gave her “less than ... [she] originally prayed for.” Obviously, the chancellor sought to achieve what he perceived as the “right” or “equitable” result, but that result was in contradiction to established law. The chancellor was manifestly wrong in this decision.
*488 ¶ 22. Although Rule 60(b) provides a chancellor with a “grand reservoir of equitable power to do justice in a particular case,”[12] “a true and genuine property settlement agreement is no different than any other contract, and the mere fact that it is between a divorcing husband and wife, and incorporated into a divorce decree, does not change its character.” Lowrey v. Lowrey, 919 So.2d 1112, 1120(¶ 31) (Miss.Ct.App.2005) (quoting West v. West, 891 So.2d 203, 210(¶ 13) (Miss.2004)). Furthermore, the Mississippi Supreme Court has stated, “parties may upon dissolution of their marriage have a property settlement agreement incorporated in the divorce decree, and such property settlement agreement is not subject to modification.” Townsend v. Townsend, 859 So.2d 370, 376(¶ 21) (Miss.2003) (emphasis added).
¶ 23. As this Court has stated, “the law favors the settlement of disputes by agreement of the parties and, ordinarily, will enforce the Agreement which the parties have made, absent any fraud [or] mistake.... ” Lowrey, 919 So.2d at 1120(¶ 30). To reiterate, even if there was fraud or misrepresentation on George’s part, case law and Rule 60(b) make it clear that any claim must be filed within six months. Although a chancellor has great equitable powers, it is not within his or her authority to circumvent the mandate of firmly established case law by merely calling a contract by another name or by trying to mold a claim so that it will fit within the parameters of different rule.
¶ 24. In a similar case in which an ex-wife claimed fraud or misrepresentation on financial statements, this Court held that “[m]ere perjury is not ground for a collateral attack on a judgment of divorce.” Brown v. Estate of Johnson, 822 So.2d 1072, 1073(¶ 4) (Miss.Ct.App.2002). As already stated, it is plausible that George simply did not know for sure what his stock was worth, but at worst, it was fraud or misrepresentation upon Lisa. Therefore, it is clearly governed by Rule 60(b)(1). This Court has previously recognized that Rule 60(b) may create a tension between equity and finality. The Brown Court reflected:
Rule 60(b) deal[s] with two concepts that tug in opposite directions.... that, human nature being what it is ... parties ... will misrepresent facts and swear falsely under circumstances, which will lead [their] actions to be difficult to discover contemporaneously with the event.... [But], at some point, there must be finality to litigation. Rule 60(b)(1) deals with these competing considerations by ... providing a window of opportunity in the post-judgment period, albeit a relatively narrow one, for a party to discover and act....
Brown, 822 So.2d at 1074(¶ 5).
¶ 25. The dissent fully illuminates this tension that Rule 60(b)(1) creates, and interprets our ruling as applauding fraudulent conduct by one spouse upon another. This could not be further from the truth. Certainly, we encourage full and honest disclosure by parties, especially within a marriage. However, we cannot dismiss our rules nor ignore the law because we perceive that a chancellor has a “grand reservoir of power” to permit such a ruling. It is incumbent upon parties in litigation to seek discovery when any doubt exists about the true facts. Additionally, at some point, litigation must end. The dissent correctly states, it is the chancellor who hears the testimonies of witnesses and observes their demeanor, but that does not equip him or her with the power to disregard clear rules based upon his or her own *489 opinion or whim. The purpose of our laws is to provide guidance, order, and finality. A chancellor’s grand reservoir of power is not an infinite power. The dissent perceives our adherence to the rules as substituting our judgment for that of the chancellor, but, even with reservations, we have declined to find that the chancellor erred when he found that George had committed fraud upon Lisa. The chancellor’s ruling relating to Lisa’s fraud claim does not preempt Rule 60(b)(1). Rule 60(b)(1) clearly requires that any claim of fraud upon a party to litigation must be brought within six months after the judgment, and such a claim does not fall within the “catch-all” Rule 60(b)(6). As stated in Tirouda, “this Court is without authority where Rule 60(b)(1), (2), or (3) is the basis for an action and the motion is brought beyond the six-month limitation.” Tirouda, 919 So.2d at 214(¶ 8).
¶26. As harsh as it may seem, Lisa’s claim is time-barred according to Rule 60(b)(1). Accordingly, by allowing Lisa to succeed on an untimely claim, the chancellor applied an erroneous legal standard. Hence, our standard of review requires that we reverse the chancellor’s ruling and render judgment for George.
¶ 27. THE JUDGMENT OF THE HINDS COUNTY CHANCERY COURT IS REVERSED AND RENDERED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLEE.
LEE, P.J., GRIFFIS, BARNES AND CARLTON, JJ., CONCUR. MYERS, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY KING, C.J, IRVING AND ISHEE, JJ. MAXWELL, J., NOT PARTICIPATING.

. Trim v. Business Communications, Inc. and Tony Bailey, Civil Action No. 2001-695, was filed in the Chancery Court of Madison County, Mississippi. A final judgment was rendered on June 6, 2002.

. Factors to be considered in valuing the stock in a closely-held corporation include the lack of marketability and lack of control discounts.

. Trim v. Trim, Cause No. G2000-684 R/l, was filed in the Chancery Court of the First Judicial District of Hinds County, Mississippi. Final judgment was rendered on July 3, 2007.

. The property settlement agreement does not reflect the value of George’s BCI stock, only the 8.05 financial statement does.

. The dissent accuses the majority of excusing George because he is "relatively uneducated,” and opines that it “does not take an advanced educational degree to tell the difference between $100,000 and over $1,000,000.” This view minimizes the complexities involved in discerning a true valuation of stock in a closely-held corporation. It is not clear from the record that George knew conclusively that his stock was worth what was listed on the financial statements.

. George also testified that between 1993 and 2000 that a secretary of BCI, Shirley Wilson, paid all of his payments because of his travel.

. Lisa even admits that she and George conspired for her to distract an inspector at one of the job sites, so that the inspector would not notice subpar workmanship.

. Lisa claims that she was not cordial with BCI personnel, and because of that, she was precluded from attaining any information from them. However, parties involved in litigation, whether a divorce or other type lawsuit, may obtain discovery from others with whom they are not cordial all the time. A lack of cordiality is not an excuse for a lack of diligence.

.The record shows that Lisa married again about a month after her divorce from George.

. There is nothing in the record that explains why the first two attorneys did not bring the suit, but perhaps it was because they recognized that the six-month window of opportunity had already closed and refused to accept Lisa's case because they believed pursuit of her claim would prove to be fruitless.

. “Fraud on the court ... is fraud which is directed to the judicial machinery itself and is not fraud between the parties or fraudulent documents, false statements or perjury. It has been held that allegations of nondisclosure in pretrial discovery will not support an action for fraud on the court.” Bulloch v. United States, 763 F.2d 1115, 1121 (10th Cir. 1985) (citation omitted). A motion based upon fraud on the court must be brought within a reasonable time. Walton v. Snyder, 984 So.2d 343, 350-51 (¶¶ 21-23) (Miss.Ct. App.2007). Fraud on an adverse party is found where only one witness commits perjury. Tirouda, 919 So.2d at 216(¶ 12). Unlike fraud on the court, fraud on an adverse party is subject to the six-month time restraint.

. See, Briney v. U.S. Fid. & Guar. Co., 714 So.2d 962, 966(¶ 12) (Miss.1998).